The first case this afternoon is Hascall v. Williams et al. We'll show for the appellant, Gerald Smith. Here are he, sir. For the appellee, Belinda Becker. Mr. Smith, you may proceed. Good afternoon, Your Honor, Counsel. May I please report? Counsel. My name is Gerald Smith from the Smith Law Firm, and I do represent the plaintiff and the appellant. What we have before us today is an appeal from the Circuit Court Order of Dismissal, based on immunity provided by the Court Immunity Act. This case is about a little girl who, despite repeated reports of ongoing bullying to school administrators, was ultimately injured, both physically and emotionally, by bullying. Bullying is a national epidemic, with a number of students committing suicide every year as a result of bullying. Everyone agrees that this epidemic needs resolution. Where we disagree in this particular case is whether immunity provided under Section 2201 of the Court Immunity Act is applicable and whether or not it can be defeated, whether by willful and wanton conduct pursuant to Section 2202 of the Court Immunity Act or willful and wanton conduct pursuant to the school code. And then as well as or through a special duty established by a special relationship. The defendant's primary argument and the Circuit Court's ruling is that absolute immunity applies. We disagree. The defendant's argument rests on two prongs. The first prong being that Section 2201 is applicable, and the second one is that Section 2201 immunity is absolute and cannot be defeated by Section 2202 or the school code or exercise of any special duty. Let me first look at that first prong, the applicability of 2201. The Illinois Supreme Court in Van Meter stated, Immunity will not attach unless a plaintiff's injury results from an act performed or omitted by a public entity in determining policy and exercising discretion. Both of those elements have to be present. The defendant claims that 2201 is applicable because the school principal, Cooper, and the superintendent, Williams, both served in a position involving determination of policy and they exercised discretion. The defendant cites to Albert B. Breen to support their point. We disagree. We believe that the Albert B. Breen case can be distinguished from the current case in that the principal in Albert's case, Principal Fink, took some affirmative action when it was reported to him that there was ongoing bullying. He brought the bullies in, talked to the bullies, he investigated what was going on, and then he disciplined them accordingly. He gave them detentions. For the current case, Cooper and Williams took no action whatsoever, except to promise that they would notify their parents. I don't understand how that doesn't constitute the exercise of discretion. That is, when you are in a position of authority and you're presented with a problem by students or any other problem that might be occurring at your school, one of the options is to decide, in the exercise of your discretion, it's not worthy of pursuing, or that no good option presents itself to be pursued. If that were the case, why doesn't that amount to the exercise of their discretion, however ill-advised or wrong they may have been? That's not the standard, of course. Yes, Your Honor, to answer your question, a lot of their discretion was removed from the school board policy, which stated that the superintendent and or his designee shall, in the word shall, so mandates it, shall properly or promptly investigate, shall issue or administer appropriate discipline, and then shall report to the parents of the alleged bullies. And that third one is really important because it's mentioned two times in their policies, not only in 7-180, which is the bullying and harassment policy, but also in 7-190. So the school policy's talking about what the principal should do removes the exercise of discretion within the meaning of the immunity statute? Well, Your Honor, yes it does, to a degree. Let me explain that a little further. It states what they shall do, what they have to do. Now, it doesn't state how they will do it. So the discretion would come in how Cooper or how Williams would conduct an investigation or how they would administer discipline. In our particular case, though, they did not. Or it also would give them discretion as to how to notify the parents of the bullies, of the aggressive behavior. It did not happen. So there was no how. Well, if I'm a principal and I investigate it and I determine that in the child's mind there were behaviors that she or he did not like and were difficult to deal with but were nonetheless part of school interactions and I determined that no bullying or harassment, as those are meant in law, occurred, why would I take a remedial action or notify the parents? I might take my remedial action by adjusting a class schedule. But I would do that, I might very well do that silently, not to call to the attention of the kids that might be bullying that I've done this in response to a complaint. Because there's an old adage with kids in school, if you report it and the kids who were allegedly bullying you find out about it, you get it worse because nobody follows through and protects because you can't do that on the playground. All that's by way of saying if I were the principal and I determined there was bullying or a fair case of bullying, maybe then I would involve the parents. If I determine there's not, but I'm wrong, I'm still exercising my discretion, aren't I? Yes, Your Honor. If you actually do conduct an investigation, the school board policy says any alleged bullying or alleged harassment of students. So therefore, if the parents, which the parents have, reported numerous times, starting actually in 2009 and then again as late as in August of 2011, they reported this ongoing bullying. There was no investigation. They weren't contacted by the principal to get more information about that. The other parents of the bullies were never notified. They didn't know anything. You seem to be parsing the term exercise of discretion. So that you seem to be saying they had no discretion on the steps they had to take, but they had discretion with regard to how to take them. Yes, Your Honor. That's correct. I don't see how that's consistent with the statute. And not only that, but the statute seems to me to a one-second paragraph, except as provided a public employee serving a position of determination of policy or the exercise of discretion, period, any, that sounds to me like any exercise of discretion, is not liable for any injury resulting from his act or omission in determining policy when acting to exercise such discretion, even though abused. Now, I've spent a lot of time around statutes, and that those last three words strike me as particularly significant, even though abused. That seems to me to the legislature saying to us in the judiciary, don't be parsing this stuff. We are imposing immunity in these kinds of cases, even if he screws up. And they're acknowledging that that might happen, but so what, because they've decided that for whatever reason, it's a matter of policy, and they're the policy makers, we don't want there to be any liability. Yes, Your Honor, you are correct. Even if he screws up, so if it's abused, yes, if there's discretion. But there was no discretion. He's mandated to perform certain functions. Now, is there any case law that would support this interpretation of the statute that says where he is directed to take certain steps, but how he takes those steps is still within his discretion, that that, for purposes of the tort immunity statute, eliminates this provision? I could find none that were directly on point with this particular case. How would that interpretation be consistent with the seeming intent of the statute that I just read to you, the even though abused line? Well, if, for example, Your Honor, the principal did investigate, and the principal did determine that there was bullying, ongoing bullying, and the principal says, I'm not taking any action. I'm not going to do anything. At least the principal exercised an intentional discretion in saying, I'm not going to do it. But in our particular situation, in our case, the principal just ignored it. She buried her head in the sand. She did not investigate. She did not administer any discipline, and she did not notify parents, which she's mandated to do. And she even stated she would do it, and the superintendent as well, stated they would notify the parents. I'm going to ask this in two parts. First, let's just assume what you're saying about this not being discretionary but ministerial, to be accurate. Exactly what, if it is ministerial in terms of what was required, exactly what was required of Cooper, what was required of Williams? And you need to be specific about this, because once you put this in the category of ministerial, it has to be if circumstance X occurs, then action Y must be taken. So what is the action you're saying was ministerial on the part of these two? All right. I think it's very clear, Your Honor. When the report or the allegation of bullying was surfaced, especially we're going to say in August of 2011, there was a requirement, a duty for the principal to investigate. Hang on, hang on. Don't go beyond investigate, because I want to break that down. Because who's to say that these allegations weren't investigated? To use that as a broad term. I mean, the fact that these were brought to the attention, these complaints were brought to the attention of Williams and Cooper, they then proceeded to assess the situation. True? There was a certain amount of assessment that was done by Cooper and by Williams here. Yes, Your Honor, and I think there might have been a minimal amount. Okay. That would constitute the initial part of an investigation. I mean, they first have to make some assessments. Is that right? Assess the, you know, who is making the complaint? Is it a trustworthy source? Who is it that complaints are being made against? These are things that actually occurred here and that these assessments were done. Now, if at that point an assessment is made and the result of the investigation is we're not going to go to this next step, well, then isn't that a matter of discretion on the part of the superintendent or the principal? Yes, Your Honor, I think that would be. Okay. But let me go back to the other question, though, too. If there was aggressive behavior that was demonstrated, for example, if the parents or the child report to the principal, I'm being bullied, well, that is aggressive behavior. If they investigate and determine that there was any form of aggressive behavior, they're mandated by board policy to notify the parents of the bully. Now, in October, the first incident occurred and the first major incident occurred where the parents went to Principal Cooper and Superintendent Williams and explained, or they actually went to the police first and explained to the police. The police did a cursory investigation. The police contacted Cooper. Nothing happened after that October incident. It wasn't until the November incident when the physical injury actually occurred to the child that Cooper finally decided to wake up and take some remedial action. And she didn't even notify the parents. It wasn't until the police notified the parents as part of their investigation. That's when the parents were informed. Now, why is that significant? Because the parents were upset that they were never informed that their children were bullies. What they did is one parent yanked her child out of that school and took her child to another school. Another parent went in the following day and was just railing on the principal, asking, demanding, why was I not notified my child was being a bully? So therefore, I think that notification part is very critical in any aggressive behavior. Can you point to the board policy that identifies what is to be done in the way of investigation, what is to be done in the way of discipline, what's to be done in the way of reporting to parents? Can you just identify here for us where that comes from? Your Honor, it doesn't say what has to be done. It just says they have to investigate. They have to notify parents. Well, even there, where does it say that it – because I want to get at the root of the basis for this claim that this is a ministerial duty. Where does it say that they have to investigate? What are the words that are used? Your Honor, in 7-180, Preventing Bullying, Intimidation, and Harassment. What page in the appendix is that? Your Honor, give me a moment. I think I have an appendix to my brief. Yes, Your Honor. Page 38 of my brief. It begins and goes into 39 of the brief. Yes, Your Honor. Is it attached in the appendix, the board policies? I believe I put it as an attachment, Your Honor. Okay. And I'm sorry, now if you would continue. If you could just isolate from the board policies what you think is the ministerial action that is to be taken by the superintendent or principal. Yes, Your Honor. As it says on page 38 at the bottom, superintendent or designee shall develop and maintain a program that fully implements. Then it goes down to paragraph, actually paragraph 1, subparagraph 1 says, full implementation of the above policies includes conducting a prompt and thorough investigation of alleged incidents of bullying, intimidation, harassment, harassing behavior, or similar conduct. B, providing each student who violates one or more of these policies with appropriate consequences of remedial action. And C, protecting students against retaliation. And then subparagraph 6 states, actively involve students' parents or guardians in the remediation of behaviors of concern. This includes ensuring that all parents or guardians are notified as required by state law whenever their child engages in aggressive behavior. And that second one is then repeated again, almost verbatim, in school board policy 1-190 entitled student discipline. And so a predicate to following through this framework here is a determination of whether or not bullying has occurred. Yes, your honor, to a degree. It would be a predicate, is determining whether or not bullying has occurred. If it has been alleged though, it requires an investigation. Would it be an investigation if I took it up with the classroom teacher? I said, what's your take on this, have you observed this? Yes, I've observed some of it. Can you more closely monitor the situation and report back to me if it worsens? Or do you think you can address this in the classroom sufficiently and the teacher either says yes or no? I mean, is that? Again, to a degree, yes, your honor. I don't know what to a degree means, because the scope of the investigation has to contain a discretionary element. You know what, I mean, you probably don't want the principal bringing a lie detector. I mean, obviously that's a foolish example or an exaggerated example, but there's a continuum. And the principal, I mean, if they've got good staff, they're going to rely on the classroom teacher. Yes, your honor, and I think if the teacher were to say, yes, I have observed this behavior, then it gets into that second aspect of it, it's still mandated. If there's aggressive behavior, the parents have to be notified. Well, what if they said, I've observed their interactions, and some of it is untoward, but some of it is initiated by the plan. I mean, they snipe back and forth at each other, so I'm going to try to separate them a little bit in the classroom, and I'll provide a little closer supervision, and we'll do some lesson plans on this, that, or the other thing. Yes, your honor, I would say that could be construed as discretionary. Well, some of this happened, didn't it? Not that we're aware of, your honor. And if we're looking at using the defendant's affidavits, those should actually be discounted altogether, because they don't really apply to a 2-6-19. They apply to 2-6-19, not 2-6-15. Pardon me, your honor? They don't apply to 2-6-15, but they do apply to 2-6-19 if it's an affirmative battle. For 6-15, they don't apply, but if it's an affirmative defense, the actual affidavits themselves are not lending themselves to affirmative defense, though. That's in support of the affirmative defense of immunity, is it not? Go ahead. Yes, sir. It would be in support of an affirmative defense of immunity if it were actually addressing that issue. All it's presenting is conflicting facts from what we're actually pleading. Okay. Thank you, counsel. You'll have a chance to address this again in rebuttal. Yes, sir. Thank you. Okay, Ms. Becker? Thank you. I would start out on the issue of the affidavits. The affidavits were presented by the school district specifically in support of its 6-19 defense of the Tort Immunity Act. It is our burden when we assert the defense to provide an affidavit if it's not present within the factual contents of the complaint itself to show why the district and the individually named defendants are entitled to immunity. What do the affidavits show? The affidavits show the discretionary and policy decisions that were made by Williams and Cooper in this instance. I recognize that the plaintiff in this case says that the district did nothing. I would argue that that is an opinion and a conclusion. But in reality, things were done in this instance. Say that again? In reality, things were done in this instance. And that is the purpose of the affidavit, showing what was done. Clearly, the plaintiff disagrees and doesn't necessarily agree that enough was done, which is sort of Albers revisited all over again. In that case, as you know, the plaintiffs disagreed with how the school district, specifically the principal and the social worker, dealt with bullying allegations. This case is no different. In this instance, Cooper and Williams took actions when confronted with bullying allegations. As outlined in our brief, Ms. Cooper originally met with the mother in this case. She followed up to talk to the teacher about it to determine what exactly was going on in that classroom. She felt, based upon those interactions, that that was the proper way to address the situation. When the mother, Ms. Haskell, was not satisfied, there was a meeting that occurred with Principal Cooper and Superintendent Williams, and other options were discussed, such as a transfer of the child in this case. And that was not a decision that Cooper and Williams thought was appropriate in that instance. And so right there, a decision was made. As a result... Wasn't there a statement that in-school transfers were not permitted? That was a policy? So if that was a policy, then that wasn't discretionary. They were just saying, no, the school district doesn't allow that. That might have been communicated that way. I know, ultimately, a transfer was made. But it was to another school, wasn't it? Yes, to another school. I thought the transfer request was, put me in another fourth grade class. You're correct, Your Honor. Yes, you said that correctly. And then the principal at that time decided that working with a social worker to come into the classroom and try to work amongst these girls to come up with a solution was a way of handling the situation. And so that happened. And ultimately, as pled by the plaintiff in their petition, numerous things did happen. The transfer occurred. There were consequences for some of the students. I mean, I understand that the plaintiff disagrees with how the timeline, but we're talking about a three-month period. I mean, it was an evolution of decisions that were made to address the situation. And again, as the court mentioned earlier, not every allegation that comes forward to Principal Cooper or Superintendent Williams is going to constitute bullying. Sometimes the allegations simply don't rise to that level. And that was the first decision that they made here as to whether this was or was not bullying. And also the kids at issue. I mean, the bullying policy at Urbana School District spans all the way from pre-K to adult education. I want to say there's nine separate schools at Urbana. Every situation is different. Every classroom is different. In this instance, these kids, my understanding, have been together for a period of time. There were different issues that were going on there. And based upon the situation that Ms. Cooper and Mr. Williams were confronted with, they felt that the way it was handled was the best way of handling it. We didn't get to this with Mr. Smith, but I want to make sure that during your portion of argument you do address this, the 202 exception to the immunity, whether or not there is a willful or wanton exception to the general immunity granted the school staff here. So just in a nutshell, from your standpoint, you say 202 doesn't apply, correct? That's correct, Your Honor. We don't believe that 202 creates an exception to the immunity provided by 201. We cited three separate cases. The Heronet decision was the first decision that we pointed to, and also the Chicago flood case was another case where that was discussed. I understand at one point there was actually some confusion on the issue, but we argue that the rise courts clarified that ultimately in its decision. We recognize that they were dealing with, I believe, 106 in that instance, but the rise court made it clear that 202 of the Tort Immunity Act cannot provide a general willful and wanton exception to 201 of the acts where it does not exist. And we would say that based upon Heronet, Chicago flood, and rise, all together show that that would be an improper reading of the Tort Immunity Act. That 201, by its unambiguous terms, provides for absolute immunity to public employees serving in a position where they determine policy and exercise discretion, even if it is abused. And there's no exception in 201. By the face of Section 201, there's no exception to it. And clearly the court cases show that 202 does not provide an exception for willful and wanton exception. Is there any recourse for parents who have their children victimized by bullying when the schools fail to address it properly? There's a complaint procedure. They certainly could go through the complaint procedure to do so. Yeah, I mean, there's the complaint procedure. In terms of a court of law... So they raise the complaint and the code, take your silly problem away from here and don't bother me. Now what? Yeah. Does the complaint move from building principal to superintendent or assistant superintendent to the Board of Education? To the Board of Education. I mean, there is a uniform complaint procedure at the district where parents can seek regress if they have a complaint where the Board of Education will get involved to assess it. I know it's shocking to contemplate that the government might miserably fail to address something appropriate, whatever branch of government it might be, in this case the school district. But let's assume, for the purpose of argument, that's what happens. And here is public schools to which, by the way, parents are required to send or perhaps submit their children, might be the better verb. So what's your recourse when they're told to quit bothering this lady and take your silly problem away and, you know, we're doing our best, blah, blah, blah. Well, I haven't had that scenario come up. Hopefully not. Hopefully not. When it does come up and that woman shows up in your office and wants to sue, what do you say is her recourse? Well, I probably, yeah, that's a tough question. Well, you would first say, no, we represent school districts. Yeah, yeah, well, obviously. We also talk about the issues with the Tort Immunity Act. I suspect she probably wouldn't be interested in the Tort Immunity Act. She'd just want to know what can we do about this. Right. Again, I would suggest going through the complaint procedure. I would think that in that instance that would address the situation. But in circumstances where there is either a need or a desire to obtain monetary relief, monetary compensation for injuries sustained, I'm not wanting to minimize what's been alleged here in the way of injuries, but let's say that it involved something much more tragic, a serious injury or death, and it was as a result of bullying. Does the Tort Immunity Act basically take away any civil cause of action against a school official? And does 2202 not provide any willful and wanton exception to that immunity in all circumstances? Yeah, I don't think 202 provides it, but I think there could be an instance where maybe an official was acting outside the scope of their employment. The example that the plaintiff gave in his initial brief was, what if the kid was tortured and murdered at the school? Yeah, and you don't need to get down that path. But just strictly negligent, let's just say negligent supervision, that would result in very serious harm. Essentially there is no civil remedy here. Right, and negligence could. I mean, a negligence action would be a separate issue. Negligence is not alleged in this case. If you had a teacher who was somehow involved, they would not necessarily have, they would not have the immunity of an administrator under 201. I mean, there certainly could be instances, you know, where that could happen, where the immunity would not be available. But in this particular instance, the immunity is available based upon the fact pattern. I think that, I mean, there are instances. I mean, there's ultra-hazardous activities that occur in districts. So the immunity, that wouldn't apply to the classroom teacher? If a classroom teacher, that is not an individual determining policy and exercising discretion. I mean, that's what we're talking about here, 201. And that's why these individuals are protected. Was the teacher sued? No. No. He was not sued. I don't know why, but I'm just. Because what if the allegations were the teacher stood back and watched snickered as this terrible bullying occurred in the back of the classroom, and as just the service mentioned, it ultimately led to some serious injury. Right. Would there be liability that the teacher would face similarly under those circumstances? Yes. They would not have a 201. They wouldn't have any immunity. Well, there are other sections of the school code that we could probably bring up. But in this instance, it was not alleged the teacher was in any way negligent. But even then, would they have an exception for willful and wanton misconduct? Under 2424? Yes. Yes, Your Honor. I mean, it would depend upon, obviously, the fact pattern involved. I could come up with a really awful one.  But they're not the ones before us. Yes, Your Honor. They're not the ones before us. Right. Were any teachers ever sued with regard to this matter? No, Your Honor. It was dealing with the principal and the superintendent. Yes, Ms. Cooper and Mr. Williams. And, I mean, as principal and superintendent, they're confronted often with allegations of all sorts. And they have to make a determination about whether it rises to the level of bullying and the proper course of action to take. And in this instance, that's what they did. Is it in dispute that Cooper did tell the plaintiff, I will talk to the alleged offender's parents? Is that disputed? No, I don't think that's disputed. But she decided that another course of action would be better once she talked to the social worker. She made a determination after that meeting that notifying the parents, there could be negative fallout. She was concerned about the issue, so she talked to the social worker and tried to determine what the best thing would be here. And the social worker talked about the negative fallout that could occur. Did she communicate that to the Haskell? I don't know if ultimately that was communicated or not after the lawsuit was filed. I don't believe initially that that was communicated to the Haskell. That is an accurate statement. The other issue that has been brought up by the plaintiff is regarding whether there is a cause of action under the Safe Schools Act. The plaintiff has tried to allege a cause of action under the Safe Schools Act. And as we argue within our brief, the Safe Schools Act was set up to create alternative schools for students who are suspended or expelled. It's an alternative to that. It is our contention that the Safe Schools Act does not raise an independent cause of action for a plaintiff. And in fact, if you read the Safe Schools Act, it specifically addresses students sixth grade and on. As we would argue, it doesn't even apply to the situation because we're talking about elementary students. When was the State Schools Act enacted? 2010. And it specifically is to create a situation for the Regional Board of Education and the school districts at issue to administratively transfer students who require an alternative education because of a suspension or expulsion. But it is our contention that it does not create any sort of independent cause of action. We also cited case law to this effect where it has been recognized that violations of the school code should be pursued via mandamus action as opposed to a tort action or a court of law. The plaintiff also had requested that the court find a special duty in this case between the plaintiff and the defendants at issue. And we addressed this in our brief as well. And the trial court, in fact, did not even address that issue. And we argue that that was appropriate since the court found that 2201 immunity applied in this instance. The Illinois legislature grants a public entity immunity and when that happens in a particular case, as recognized by the court on the trial level, it would not be appropriate for them to find a special duty in this instance to impose liability upon a public entity after a court has found that the entity is immune from liability. Because the trial court found that the Tort Immunity Act immunizes the defendants, we argue that whether there is a special duty in this instance was irrelevant and thus it was appropriate for the trial court not to address that particular issue. And that's essentially it. We would argue that this case is very similar to Albers. Again, it's a situation where we believe the plaintiff just basically disagrees with how the situation was handled. They believe that based upon how it was handled and appropriately that it escalated the situation. And that's exactly the allegation in Albers. And that case is directly on point. Even though the plaintiff disagrees with what the administrators did in this instance, that disagreement is not appropriate to defeat the 201 immunity. And again, although they allege the wanton and willful conduct, 202 simply does not provide an exception to the absolute immunity of 201. So we would ask that the court follow Albers and find the fact pattern to be similar. In this instance. Your position would be, I take it, you could admit any or all of the factual allegations and still be immune. We do. And we do admit the factual allegations. We don't admit the conclusions that we did nothing, the opinion that we did nothing. But if you look at the allegations in the plaintiff's complaint, we admit those allegations and we have supplemented them. You could have an affidavit from the principal and the teacher, or from the principal and the superintendent rather, that said, this is what we did, we failed. It was an abject failure, what we did. This girl should have deserved better. Yes. But the same legal result. I agree with that. I'm asking you. I understand. Yes, that is our position. Because in that instance a determination would be made. I mean, there's no question meetings were held that Ms. Cooper met with Ms. Haskell in this case. And then she went to the teacher and tried to address it. That they met with her again. Where Superintendent Williams got involved and a meeting took place. That a curriculum was developed by the social worker to go in the classroom to try to resolve the situation. But again, I would be arguing the same thing. I see that the light came on. Is that just a warning? Oh, thank you, sir. But if they would have come to Sandra Cooper, alleged bullying, and Sandra Cooper said, well, I don't think bullying is going on here. I've assessed the situation. I don't think this rises to the level. I still think that within itself would be her making a discretionary policy decision. And she might tell you now, maybe there's things I could have done differently. But that's obviously Monday morning quarterbacking after the fact. Clearly, no one wanted this to escalate to the point that it did. But based upon the age of the students and the situation that Sandra Cooper was confronted with, along with Superintendent Williams, they felt that this was appropriate response. And again, we're talking about a three-month period. This didn't just happen overnight. I mean, she spent a series of time trying to address the situation within that classroom. And I think also it's important to recognize the principal in each different school has the discretion to implement their bullying policy how they see fit. And that is something Sandra Cooper had been doing since 2007. She had curriculum. She had different boot camps that were taking place. This was before the bullying policy was even passed at the district, that this is something she was trying to address and continuously tries to address within her specific elementary school. Other elementary principals may do it differently, and in fact do do it differently. In the high school, they do it differently. In the middle school, they do it differently. But this is something that she was on a continual basis trying to address. And again, in 2011-12 school year, specifically new things were done. And that is outlined in her affidavit in an effort to try to address the situation. So I think all of those factors show that, again, in this instance, that the administrators at issue were engaging in discretionary policy decisions when confronted with these bullying allegations. Thank you, Counsel. Thank you. Mr. Smith, any rebuttals yet? Your Honor, first off, we would like to clarify, it wasn't a three-month period that this bullying occurred. It was a period of over two years. It just escalated within the last three months to a physical altercation to where she got hurt. I would like to address the statement regarding Reese. The Reese case does not specify that 202 and 201 are related. It doesn't even address those. It addresses 202 to 4106. And there is an implication in there where they talk about willful and wanton behavior, willful and wanton conduct in other provisions, and they are correct. Reese is correct. There is no willful and wanton provision in 201. However, there is that phrase or that conditioning clause, except as otherwise provided by statute, which is not found anywhere in Article IV. And that is not even found in Article III, except as otherwise found in this act in Article III. The except as otherwise provided by statute is only found in two locations, and that's 2201 and 2204, and they're very similar. I just wanted to clarify that. With regards to the special duty, we still believe there was a special duty, and we've argued that in the briefs. The special duty was generated due to the special relationship, and the special relationship occurred when the reports of bullying occurred or were given to the principal and the superintendent. The principal and the superintendent then had a duty to respond and take action and to protect the safety of the CH, and they did not. With regards to the procedure and the complaint procedures, the plaintiff did notify the principal. She was following proper protocols. She notified the principal, she notified the superintendent, and she was on target to notify the board. She actually didn't notify the board in December, but the incident occurred where her daughter was physically injured in November, so it precluded that. You asked the question about whether the teacher was sued. The teacher was not included in the lawsuit because the teacher was sympathetic and understood the bullying that was ongoing and did his best to isolate the individuals from each other and to protect CH from the ongoing bullying. The two incidents that occurred where CH was physically impacted were outside the supervision, the direct supervision of that teacher. Mr. Smith? Yes, sir. Just briefly, in the affidavits that were submitted, Williams at paragraph 7 of his affidavit and Cooper at paragraph 8, there's a description of what actions were taken in terms of response to the allegations of bullying. And do you dispute, was there any evidentiary material opposing the allegations contained in those two paragraphs? Your Honor, we have no knowledge of anything. We did not submit anything in rebuttal to those, no. Okay, all right. And do those actions constitute, in your opinion, actions involving investigation of the complaints of bullying? Your Honor, off the top of my head, I don't know because I don't have a copy of that with me, so I can't address that directly. In closing, though, the plaintiffs do applaud the principle for taking proactive measures in trying to address bullying school-wide and at least establishing the programs that she did. But we believe that she failed when there was a specific incidence of bullying that was reported and she was mandated to handle, and she failed to do that. So in conclusion, we do believe there was a special duty and that can defeat 2201 immunity. As this Court ruled, a special relationship, a special duty can defeat 2204 immunity. That was in the Doe 3 case in 2011, and the Supreme Court upheld that except on different measures, but the same result in 2012. So that special duty can defeat immunity, a general immunity that specifies 2204 immunity. Thank you, counsel. Thank you. We'll take another advisement and recess for a few moments.